UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

CRYSTAL MCCLAIN, PORSHA JACKMAN, SHALONDA SOLOMON, JASMIN JOHNSON, SUSAN BARRETT, JENNIFER JACOVINO, and JOSEPH JACOVINO,

**COMPLAINT**

Plaintifs,

**JURY TRIAL DEMANDED**

-against-

U.S. COACHWAYS, INC., KM ENTERPRISES OF NY, INC., AMERICAN TOUR & TRAVEL, INC., SUBOUT.COM, LLC, ULTRA EXPRESS COACH, INC., MARK TELMANY, Individually, EDWARD TELMANY, Individually, and NICHOLAS CIANCIARUSO, Individually,

Defendants.

-------------------------------------------------------------------X

Plaintiffs Crystal McClain ("Ms. Mc Clain"), Porsha Jackman ("Ms. Jackman"), Shalonda Solomon ("Ms. Solomon"), Jasmin Johnson ("Ms. Solomon"), Susan Barrett ("Ms. Barrett"), Jennifer Jacovino ("Mrs. Jacovino") and Joseph Jacovino ("Mr. Jacovino"), (collectively, "Plaintiffs"), by and through their attorneys, Joseph & Norinsberg, LLC, as and for their Complaint against U.S. Coachways, Inc., KM Enterprises of NY, Inc., American Tour & Travel, Inc., Subout.Com, LLC, Ultra Express Coach, Inc., Mark Telmany (hereinafter "M.T.") individually, Edward Telmany (hereinafter "E.T.") individually, and Nicholas Cianciaruso (hereinafter "N.C.") individually, (collectively the "Defendants"), allege and state as follows:

**NATURE OF CASE**

1.     Plaintiffs bring this civil action based upon Defendants' violations of: (i) the Equal Benefit Clause of 42 U.S.C. § 1981 ("Section 1981"); (ii) the Fair Labor Standards Act of 1938, as Amended by the Equal Pay Act Of 1963 ("Equal Pay Act"), 29 U.S.C. § 206, *et. seq*.  Denial of Equal Pay for Equal Work; (iii) the Family and Medical Leave Act of 1993 29 U.S.C. § 2601 *et.*

1

*seq.* ("FMLA"); (iv) race anti-discrimination provisions of the New York State Human Rights Law ("NYSHRL") Exec. L. § 296 *et. seq*., and Title 8 of the Administrative Code of the City of New York, also known as the New York City Human Rights Law ("NYCHRL"); (v) gender and pregnancy anti-discrimination provisions of the NYSHRL and NYCHRL; (vi) the requirement that employers engage in an interactive process and provide reasonable accommodations when needed, pursuant to the NYSHRL and NYCHRL; (vii) familial status and caregiver anti-discrimination provisions of the NYSHRL and NYCHRL; (viii) anti-sexual harassment provisions of the NYSHRL and NYCHRL; (ix) anti-retaliation provisions of the NYSHRL and NYCHRL; (x) the aiding and abetting provisions of the New York State Human Right Law ("NYSHRL") (xi) intentional infliction of emotional distress; and (xii) any other cause(s) of action that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

2.      Defendants operate and manage their national bus charter company with a complete disregard for the legal rights of their employees. Although Defendants claim to be "forward thinkers and innovators,[1]" their employment practices reveal bigoted and dated ideologies of how women and black people should be treated in the workplace. This lawsuit centers on Defendants' history of illegal discriminatory and retaliatory practices in the workplace.

3.      As set forth in more detail below, Defendants' repeatedly engaged in egregious acts of discrimination based upon race, as well as gender in the form of pregnancy discrimination and

---

[1] https://www.uscoachways.com/?utm_source=google&utm_medium=cpc&utm_campaign=NYC%20DMA&utm_keyword=us%20coachways&gclid=EAIaIQobChMIpeiC5dW96AIVStyGCh2YBwOBEAAYASAAEgKEdvD_BwE (last viewed on April 3, 2020).

sexual harassment. Defendants engaged, if not encouraged, deplorable acts of discrimination against Plaintiffs, Ms. McClain, Ms. Johnson and Ms. Solomon. Throughout their tenure Defendants permitted the regular use of the "N" word, along with other disparaging comments about "black" people such as, "Black B**ch" and "N***er B**ch," as well as physical threats of violence.

4.      Further, Defendants forced Ms. Barrett and Mrs. Jacovino to endure multiple acts of discrimination throughout their respective pregnancies. In each instance, Defendants engaged in verbal abuse, name-calling, as well as openly shaming and ridiculing Plaintiffs in their decisions to have children. Indeed, while Defendants technically allowed Plaintiffs go out on maternity leave, in actuality, Defendants expected and directed both women to continue to work full time from home during their respective maternity leaves.

5.      Defendants also condoned open acts of sexual harassment in the workplace against their female employees. Defendant N.C. sexually harassed Ms. Johnson by subjecting her to inappropriate, sexually charged comments and piercing sexual stares.

6.      Further, Defendants have a shameful history of engaging in retaliatory practices against employees who exercise their rights under the anti-discrimination laws. On multiple occasions, Plaintiffs were harassed, threatened, demoted and even terminated for exercising their legal rights and/or objecting to Defendants' illegal practices.

7.      In addition to the substantial illegal conduct cited above, Defendants subjected Plaintiff Joseph Jacovino to extreme verbal abuse and threats of physical violence, which caused Mr. Jacovino severe emotional distress and forced him to tender his resignation.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the Equal Benefits Clause of 42 U.S.C. Section 1981, the FMLA and the Equal Pay Act, 29 U.S.C. § 206, *et. seq*.  This court also has supplemental jurisdiction over Plaintiffs' related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

9.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) (2), as all actions comprising the claims for relief occurred within this judicial district, and pursuant to 28 U.S.C. § 1391(b) (1), as the Defendants reside within this judicial district.

## DEMAND FOR A JURY TRIAL

10.    Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

11.    At all relevant times herein, Plaintiff Ms. McClain was and is a resident of Union County, in the State of New Jersey, with her primary place of work being in the City and the State of New York.

12.    Plaintiff Ms. McClain was an "employee" and "person" entitled to protection as defined by the Equal Benefits Clause, the NYSHRL and NYCHRL.

13.    At all relevant times herein, Plaintiff Ms. Jackman was and is a resident of Essex County, in the State of New Jersey, with her primary place of work being in the City and State of New York.

14.    Plaintiff Ms. Jackman was an "employee" and "person" entitled to protection as defined by the Equal Benefits Clause, the NYSHRL and NYCHRL.

15. At all relevant times herein, Plaintiff Ms. Solomon was and is a resident of Union County, in the State of New Jersey, with her primary place of work being in the City and State of New York.

16. Plaintiff Ms. Solomon was an "employee" and "person" entitled to protection as defined by the Equal Pay Act, Equal Benefits Clause, the NYSHRL and NYCHRL.

17. At all relevant times herein, Plaintiff Ms. Johnson was and is a resident of the City and State of New York.

18. Plaintiff Ms. Johnson was an "employee" and "person" entitled to protection as defined by the NYSHRL and NYCHRL.

19. At all relevant times herein, Plaintiff Ms. Barrett was and is a resident of Union County, in the State of New Jersey, with her primary place of work being in the City and State of New York.

20. Plaintiff Ms. Barrett was an "employee" and "person" entitled to protection as defined by the FMLA, the NYSHRL and NYCHRL.

21. At all relevant times herein, Plaintiff Mrs. Jacovino was and is a resident of the City and State of New York.

22. Plaintiff Mrs. Jacovino was an "employee" and "person" entitled to protection as defined by the FMLA, the NYSHRL and NYCHRL.

23. At all relevant times herein, Plaintiff Mr. Jacovino was and is a resident of the City and State of New York.

24. Plaintiff Mr. Jacovino was an "employee" of the Defendants.

25. At all relevant times herein, U.S. Coachways, Inc. was and is a domestic corporation, with its principal place of business located at 100 St. Mary's Avenue, Staten Island, New York.

26. At all relevant times herein, U.S. Coachways, Inc. was and is an "employer" within the meaning of the Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

27. At all relevant times herein, KM Enterprises of NY, Inc. was and is a domestic corporation, with its principal place of business located at 100 St. Mary's Avenue, Staten Island, New York.

28. At all relevant times herein, KM Enterprises of NY, Inc. was and is an "employer" within the meaning of the Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

29. At all relevant times herein, American Tour & Travel Inc. was and is a domestic corporation, with its principal place of business located at 100 St. Mary's Avenue, Staten Island, New York.

30. At all relevant times herein, American Tour & Travel, Inc. was and is an "employer" within the meaning of the Equal Pay Act, Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

31. At all relevant times herein, Subout.com, LLC was and is a foreign limited liability corporation, with its principal place of business located at 100 St. Mary's Avenue, Staten Island, New York.

32. At all relevant times herein, Subout.com LLC was and is an "employer" within the meaning of the Equal Pay Act, Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

33.     At all relevant times herein, upon information and belief, Ultra Express Coach, Inc. was and is a domestic corporation, with its principal place of business located at 480 Wild Avenue, Staten Island, New York.

34.     At all relevant times herein, upon information and belief, Ultra Express Coach, Inc., was and is an "employer" within the meaning of the Equal Pay Act, Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

35.     At all relevant times herein, Defendants M.T., E.T. and N.C. were the President, Vice-President and Chief Operating Officer, respectively, of U.S. Coachways, Inc., and, upon information and belief, are the owners and the officers of the named corporate Defendants.  As such, Defendants M.T., E.T. and N.C. were responsible for the terms and conditions of employment of each Plaintiff, and were therefore "employers" or "persons" within the meaning of the Equal Pay Act, Equal Benefits Clause, the FMLA, the NYSHRL and the NYCHRL.

## BACKGROUND FACTS

36.     U.S. Coachways, Inc. ("US Coachways") is a for-profit domestic company providing charter bus services nationwide.  US Coachways' primary office is located in Staten Island, New York.

37.     KM Enterprises of NY, Inc. ("KM"), is an affiliate, subsidiary and related company of US Coachways that is owned and managed by Defendants M.T., E.T. and N.C.  Specifically, employees who work for US Coachways also render services for KM.

38.     American Tour & Travel, Inc. ("ATT"), is an affiliate, subsidiary and related company of US Coachways that is owned and managed by Defendants M.T., E.T. and N.C. Specifically, employees who work for US Coachways also render services for ATT.

39.     Subout.com, LLC ("Subout") upon information and belief, is an affiliate, subsidiary and related company of US Coachways that is owned and managed by Defendants M.T., E.T. and N.C.  Specifically, employees who work for US Coachways also render services for Subout.

40.     Ultra-Express Inc. ("Ultra"), is an affiliate, subsidiary and related company of US Coachways that is owned and managed by Defendants M.T., E.T. and N.C.  Specifically, employees who work for US Coachways also render services for Ultra.

41.     Each of the corporate Defendants, US Coachways, KM, ATT, Subout and Ultra (collectively, "Coachways"), are affiliated companies that are owned and/or operated by Defendants M.T., E.T. and N.C., and they collectively employ approximately seventy (70) employees, including Plaintiffs herein.

## CRYSTAL MCCLAIN

### *Ms. McClain's Employment with Defendants*

42.      On December 11, 2017, Defendants hired Ms. McClain, a black woman, as a Human Resources ("HR") Manager and paid her an annual salary of $60,000.

43.     Throughout Ms. McClain's employment, Defendants regularly directed her to perform duties which fell outside her HR manager role, including resolving issues relating to M.T.'s suspended driver's license, paying parking tickets and E-ZPass bills for M.T. and his family, ordering cell phones and providing coverage for the front desk.

44.     Defendants never gave Ms. McClain the authority of an HR manager.  Whenever Ms. McClain would attempt to make an HR related decision such as disciplining, hiring or firing an employee, Defendants would stop her and instruct her that only M.T., E.T., N.C., and Defendants' outside HR consultant Nakisha Smith ("Smith") had such authority.

45. Throughout her employment, Defendants subjected Ms. McClain to t discrimination and harassment on the basis of her gender and race, which took the form of a hostile and offensive work environment. When Ms. McClain objected to this unlawful discriminatory treatment, Defendants retaliated against her by amplifying the discriminatory conduct, which resulted in Ms. McClain's constructive discharge on January 18, 2019.

***Ms. McClain is Subjected to a Hostile Work Environment Based Upon Her Race***

46. At all times, Defendants' behavior, statements, and tone towards Ms. McClain and other black employees conveyed an open contempt towards black people.

47. For instance, in August of 2019, while providing onsite training to employees at Defendants' bus yard, Ms. McClain was repeatedly subjected to racist comments and threats from Defendants' mechanical manager Vincent Minutolo ("Minutolo").

48. Specifically, Minutolo, a male Caucasian employee, said to Ms. McClain: "I'm going to sic the dog on you black people!" Defendants kept a dog onsite for security purposes.

49. That same day, a black female employee approached Ms. McClain and shared with her that Minutolo had frequently used the "N" word at work, and had often made disparaging comments about black people in the workplace.

50. On a previous occasion, Ms. McClain overheard Minutolo respond to M.T. by saying: "I am going to make those N***ers pay out of their pocket."

51. Having experienced Minutolo's racist comments firsthand, Ms. McClain did not need to investigate further, and reported Minutolo's unlawful behavior to HR Consultant Smith. Despite learning of the complaint, however, E.T. and M.T. elected not to terminate Minutolo, or engage in any meaningful corrective action.

52.     Immediately following Ms. McClain's reporting of this incident, M.T. proudly boasted to Ms. McClain: "Yeah, I'm a racist."

***Defendants Unlawfully Retaliate Against Ms. McClain for Objecting to Their Repeated Acts of Discrimination and Retaliation***

53.     Soon after Ms. McClain reported the above referenced incidents, Defendants significantly diminished Ms. McClain's role and responsibilities.  Defendants then promoted a *bus driver*, Ronnie Crawford ("Crawford"), a male, to the position of Transport Specialist and directed Crawford to perform many of Ms. McClain's former duties and paid him $1800.00 per week, which was $300.00 more than Ms. McClain had made when she had performed the same duties.

54.     M.T. then directed his wife, Deana Telmany ("D.T.") and their daughter, neither of whom had any HR experience, to regularly review Ms. McClain's work.

55.     On or about December of 2019, Defendants received notice that Plaintiff Mrs. Jacovino was alleging that Defendants' had violated among other laws, Mrs. Jacovino's rights under FMLA, as set forth in more detail below.

56.     In response to Mrs. Jacovino's allegations, D.T. directed Ms. McClain to provide a false statement to Defendants' counsel that Defendants had, in fact, provided Mrs. Jacovino with FMLA paperwork and that Mrs. Jacovino had stolen from Defendants.  When Ms. McClain refused to provide this false statement, M.T. insisted by telling her that Defendants were "under attack."

57.     On January 18, 2020, no longer capable of tolerating a workplace that openly engaged in illegal acts of discrimination and retaliation, Ms. McClain tendered her resignation.

## PORSHA JACKMAN

***Ms. Jackman's Employment with Defendants***

58.     Defendants hired Ms. Jackman, a black woman, in or around June of 2013, as a driver.

59. During the course of her five (5) years of employment with Defendants, Ms. Jackman was an exemplary employee who was promoted to dispatcher and safety coordinator.

60. Throughout her employment, Defendants repeatedly discriminated against Ms. Jackman on the basis of her gender and race, which created a hostile and offensive work environment. When Ms. Jackman objected to this unlawful discriminatory treatment, Defendants retaliated against her by amplifying the discriminatory conduct, which culminated in Ms. Jackman's constructive discharge in October of 2019.

***Ms. Jackman is Subjected to Discrimination Because of Her Race***

61. Shortly after Ms. Jackman commenced her employment with Defendants, she was forced to endure constant blatant, open and egregious acts of racial discrimination in the workplace.

62. Specifically, mechanical manager, Minutolo routinely used the "N" word, and ignored Ms. Jackman's requests that he refrain from using this inflammatory and offensive term.

63. Minutolo openly referred to Ms. Jackman as a "Black Bitch" and "N***er Bitch."

64. Ms. Jackman also witnessed Minutolo announce Ms. McClain's presence in Defendants' yard by saying: "Why is this black bitch here?" Minutolo then commanded Defendants' dog., Shank, to "Get that black bitch."

65. Drivers regularly complained to Ms. Jackman about Minutolo's unlawful conduct. Minutolo got into multiple physical altercations with drivers who objected to his use of the "N" word.

66. Ms. Jackman reported Minutolo's unlawful conduct to Defendants' Director of Operations, Kimberly Calabrese ("Calabrese"). In response, Calabrese dismissed the complaints

and told Ms. Jackman: "They (referring to the drivers who had complained) Fuc***g need this job, why else would they be here?"

67. On a number of occasions, Ms. Jackman also reported Minutolo's unlawful conduct to M.T. M.T. would always promise to address the issue with Minutolo, but he never took any corrective action.

68. Consequently, Defendants' willful failure to take any corrective action caused Minutolo to openly and brazenly continue with his racist remarks. Indeed, Ms. Jackman overheard Minutolo tell Calabrese and M.T. that "Black people are the stupidest people on earth." As with all of Minutolo's prior racist comments, Defendants chose to take no action to punish, or in any way address, Minutolo's grossly improper comments.

### *Defendants Unlawfully Retaliate Against Ms. Jackman*

69. Minutolo interpreted Defendants' silence towards his racist language as a license to continue, and he upped the ante and engaged in acts of retaliation against Ms. Jackman for objecting to his discriminatory conduct.

70. Minutolo became openly hostile towards Ms. Jackman.

71. For example, whenever Ms. Jackman discussed her responsibilities with other employees, Minutolo would intervene, yell at her and say: "Who do you think you are, you are a nobody here!"

72. Additionally, when Minutolo saw Ms. Jackman, he would slam doors and/or tools, and referred to her as the "N***er Cry baby."

73. Further Minutolo would attempt to intimidate Ms. Jackman with Defendants dog Shank, whom he claimed was predisposed to attack black people. Minutolo explained that Shank, despite being color blind, became alarmed by "N***gers" who appeared to him as shadows.

74.     Tensions continued to rise between Ms. Jackman and Minutolo.  In or around August of 2019, Minutolo accused Ms. Jackman of delaying a bus inspection and confronted her by storming into Ms. Jackman's office calling her a "Black N***er" and a "Stupid Bitch." Minutolo then forcefully pulled Ms. Jackman's office door off its hinges and punched a hole through the wall.

75.     Ms. Jackman reported the incident to Calabrese, who told her: "I am not sure why he has to act like that" and promised to speak to M.T.

76.     A few days later, M.T. spoke to Ms. Jackman about the incident and told her: "You need to learn how to talk and work with Vinny (Minutolo)."  In doing so, he suggested to Ms. Jackman that she was somehow responsible for what transpired.  Additionally, M.T. assigned Ms. Jackman the responsibility of diffusing future conflicts between Minutolo and other black drivers.

77.     Minutolo did not cease engaging in discriminatory conduct.  Defendants did punish Minutolo, nor did they take any corrective action towards him.  As a result, Minutolo became emboldened and his unlawful conduct only grew worse.

78.     M.T.'s dismissive, victim-blaming response exacerbated Ms. Jackman's already severe emotional distress resulting from the incident.

79.     In August of 2019, Ms. Jackman suffered a panic attack while at work, requiring her to seek medical treatment.

80.     In October of 2019, as a result of being forced to work in this insufferable and hostile work environment, Ms. Jackman tendered her resignation to Defendants.

## SHALONDA SOLOMON

***Ms. Solomon's Employment with Defendants.***

81.     On January 26, 2014, Defendants hired Ms. Solomon as a sales representative.   On or about January of 2015, Ms. Solomon was promoted to senior sales representative.

82.     Throughout her employment, Ms. Solomon was subjected to blatant discrimination and harassment on the basis of her gender and race, which created a hostile and offensive work environment.  When Ms. Solomon objected to this unlawful discriminatory       treatment,       the Defendants retaliated against her by increasing the discriminatory conduct, which culminated in Ms. Solomon's constructive discharge on October 15, 2019.

***Ms. Solomon is Subject to Blatant Discrimination by Defendants Based Upon Her Race and Sex***

83.     Ms. Solomon is a Black woman.  From the start, Defendants treated Ms. Solomon less favorably than her male counterparts based on her race.

84.     Unlike her male counterparts, Ms. Solomon received limited access to new business leads.   As a result, Ms. Solomon always had to work harder to keep up with Defendants' mandatory sales quotas.

85.     In or around December of 2016, Ms. Solomon learned that sales representatives James Dinardo ("Dinardo"), Dylan Rosenthal ("Rosenthal") and Paul Legotti ("Legotti"), three Caucasian males, received higher bi-weekly draw amounts.  These individuals had less experience than Ms. Solomon and performed similar duties and sales, yet they were paid substantially more than her.

86.     Defendants also regularly overlooked Ms. Solomon for promotions.  For example, on or about November of 2018, Legotti was promoted to Sales Liaison. Similarly, on or about January of 2019, Rosenthal was promoted to Sales Manager.

87.     Ms. Solomon was also forced to endure blatant, open, and egregious acts of racial harassment in the workplace.

88.     Sales representative Paul Conti ("Conti"), a white Caucasian male, regularly used the "N" word.

89.     At all times, Conti ignored Ms. Solomon's requests that he refrain from using this inflammatory and highly offensive racial term.

90.     Conti was so confident of Defendants' unwritten policy permitting and sanctioning racial discrimination that, while within earshot from M.T. and other managers, he would openly use the "N" word out loud to other co-workers.   At all times, M.T. failed to address, much less discourage, Conti's unlawful behavior.

91.     After enduring Conti's racist behavior for a long period of time, Ms. Solomon finally summoned the courage and complained about Conti's conduct to M.T.  In response, M.T. feigned ignorance of the issue, and told Ms. Solomon that he would address it.   However, Defendants did not investigate or engage in any meaningful corrective action.

92.     Moreover, on or about May of 2019, Ms. Solomon learned that Conti also received a higher bi-weekly draw amount.  Conti had less experience than Ms. Solomon and had performed similar duties and sales, yet he was paid substantially more than her.

***Defendants' Unlawfully Retaliate Against Ms. Solomon***

93.     On or about May of 2019, Ms. Solomon addressed the disparity between her draw amount and the draw amounts of the above refenced male sales representatives with her supervisor Salvatore Ciaravino ("Ciaravino").  In response, Ciaravino told Ms. Solomon he would discuss the matter with upper management and get back to her.

94.     However, shortly after the meeting, Ciaravino began to harass Ms. Solomon with questions and suggestions such as, "Do you want to be here?" "You look like you don't want to be here anymore," and "You should just quit."

95.     After peppering Ms. Solomon with the above questions and suggestions, Ciaravino taunted her in a blatantly sexist manner, telling her that: "It looks like you are about to cry, do you need a tissue?"

96.     During this time, Ciaravino informed Ms. Solomon that Defendants' upper management was not happy with her inquiry regarding her draw amount.

97.     On October 15, 2019, Ciaravino summoned Ms. Solomon to his office and informed her that upper management wanted to get rid of her. Ciaravino offered Ms. Solomon an employment reference conditioned on her resignation, and seeing no other viable options, Ms. Solomon felt compelled to tender her resignation.

## JASMIN JOHNSON

### *Ms. Johnson's Employment with Defendants*

98.     Defendants hired Ms. Johnson on March 9, 2015, as a clerk for Defendants' guest services department.

99.     Throughout her employment, Ms. Johnson was recognized as an exemplary employee who was pivotal in Defendants' social media platform expansion and drastically improving Defendants' rating with customers.

100.   Despite her accomplishments, Ms. Johnson was subjected to blatant acts of gender discrimination and sexual harassment from her supervisor N.C., which created a hostile and offensive work environment. When Ms. Jackman objected to this unlawful discriminatory

treatment, N.C. deployed a retaliatory agenda of flagrant harassment, which culminated in Ms. Johnson's constructive discharge on July 14, 2018.

### *Ms. Johnson Becomes the Target of Defendants' Sexual Harassment*

101.    On or about July of 2016, Defendant N.C. became Ms. Johnson's supervisor.

102.    On or about September of 2017, N.C.'s assistant Yolanda Torres ("Ms. Torres") informed Ms. Johnson that she was in an intimate relationship with N.C.

103.    During this time, N.C. began to inappropriately ask Ms. Johnson questions about her personal life.

104.    N.C. regularly peppered Ms. Johnson with unsolicited compliments such as, "I love how you wear that outfit," "I like how you did your makeup," "You have a nice figure" and "You are so beautiful."   Ms. Johnson became visibly upset by N.C.'s conduct, yet N.C. remained undeterred.

105.    N.C. would often subject Ms. Johnson to prolonged and piercing sexual stares.   To ensure that Ms. Johnson understood the intent behind his illicit body scans, N.C. punctuated these inappropriate stares with comments such as: "Spanish women are so hot," "Spanish women are the most affectionate," and "I would stray for a Spanish woman."

106.    Additionally, N.C. repeatedly summoned Ms. Johnson to his office to discuss personal non-work-related matters.

107.    On several occasions, Ms. Johnson told N.C. his actions made her extremely uncomfortable and asked him to stop.   In response, N.C. would ignore her objections and intensified the volume of harassment he inflicted on her.

108.    On or about April of 2018, Ms. Torres informed Ms. Johnson that she was dating someone and was looking to end her relationship with N.C.  Ms. Torres told Ms. Johnson that N.C.

refused to break up with her and was persistent about spending time with her. While appearing to be alarmed, Ms. Torres asked Ms. Johnson to help her avoid and/or interrupt any closed-door meetings with N.C.

***Defendants Unlawfully Retaliate Against Ms. Johnson***

109.     After speaking to Ms. Torres, and realizing that she was not the only female employee that NC was sexually harassing, Ms. Johnson summoned the courage to report N.C.'s unlawful conduct to HR.

110.     In response, HR moved Ms. Johnson's desk away from N.C. and asked her to communicate with N.C. via email.

111.     In fear of retaliation, Ms. Johnson copied HR in all of her emails to N.C. This angered N.C., who in retaliation began to scrutinize Ms. Johnson's work performance.

112.     In clear retaliation for refusing to meet with him in his office, N.C. disciplined Ms. Johnson for having an attitude and lacking poor communications skills. In all her years, this was the first time that Defendants accused her of having an "attitude" or "poor communication skills."

113.     Desperate for a pretext to further his retaliatory agenda, N.C. openly disciplined Ms. Johnson for not knowing how to make coffee.

114.     On July 14, 2018, Ms. Johnson could no longer handle N.C.'s discriminatory and retaliatory actions, as well as Defendants' failure to take any corrective action, and she tendered her resignation.

## **SUSAN BARRETT**

***Ms. Barrett's Employment with Defendants***

115.     Defendants hired Ms. Barrett in or about December of 2011, as a full-time sales representative with a starting salary of a $1,500 bi-weekly draw, plus a 20% sales commission.

116. Throughout her eight (8) years of employment, Ms. Barrett proved to be a skilled sales representative who consistently met and exceeded Defendants' sales quotas.

117. Despite Ms. Barrett's exemplary performance, Defendants subjected her to a continuous pattern of discrimination and retaliation, which began the moment Ms. Barrett disclosed her first pregnancy to Defendants in October of 2012 and ended with Defendants' unlawful termination of her employment in September of 2018. Throughout this period, Ms. Barrett was forced to endure Defendants' systemic and continuing policy and practice of gender, pregnancy, and familial status discrimination.

***Defendants Discriminate Against Ms. Barrett Because of Her Gender, Pregnancy and Familial Status***

118. In October of 2012, Ms. Barrett informed her boss, Defendant E.T. that she was pregnant and that, because of a detected cervical insufficiency, her doctor had prescribed that she be put on bedrest to ensure a healthy pregnancy.

119. Upon learning of Ms. Barrett's pregnancy and medically required bedrest, E.T.'s response was to yell at her and ask her: "Who do you think you are, getting pregnant without being married?" and "Who said I'm going to keep paying you?"

120. At this time, Mrs. Barrett had worked at least 1250 hours during the previous 12-month period and was therefore eligible for FMLA leave.

121. Although Defendants knew that Ms. Barrett's doctor had prescribed that she avoid standing, walking, sitting-up and stress, Defendants directed Ms. Barret to work from home full-time, up until the birth of her child in January of 2013.

122. At no time during her pregnancy did Defendants in any way advise Ms. Barrett of her rights to take FMLA leave.

123.    Consequently, even after giving birth, Defendants continued to require Ms. Barrett to work full-time from home.

124.    Following her first pregnancy, and as part of a continuing act of retaliation and discrimination, Defendants grew increasingly hostile towards Ms. Barrett.

125.    By way of example, E.T. would regularly marginalize Ms. Barrett by telling her: "Remember you're a woman - don't speak unless you are spoken to."

126.    Additionally, throughout 2013, Defendants decreased the number of local leads they assigned to Ms. Barrett, and assigned her an increased amount of complex out-of-state leads.  As a result, Ms. Barrett made less money on commission.  When Ms. Barrett addressed this issue with E.T., his response was "You did this to yourself."

***Defendants' Continuous and Systemic Discriminatory Policy and Practice of Gender and Pregnancy Discrimination***

127.    In January of 2014, Ms. Barrett again informed E.T. that she was pregnant, this time with twins, and that because of her prior history of cervical insufficiency, she needed to go on bedrest.  Similar to his response to Ms. Barrett's first pregnancy, E.T. responded once again with a highly offensive and grossly improper remark: "How stupid are you to get pregnant again?!"

128.    At this time, Mrs. Jacovino had worked at least 1250 hours during the previous 12-month period, and therefore was eligible for FMLA leave.

129.    Despite Ms. Barrett's doctor prescribing that she had to avoid standing, walking, sitting-up and stress, Defendants required Ms. Barrett to continue to work from home on a full-time basis, just as they had done to her during her first pregnancy.

130.    Defendants allowed Ms. Barrett to have an assistant while she worked from home, but only on the condition that Ms. Barrett would pay for half of the assistant's salary from her own earnings.

131. Moreover, in or around April 2014, manager Salvatore Ciaravino ("Ciaravino"), abruptly removed the assistant from Ms. Barrett's home, requiring the assistant to work in the office, despite knowing Ms. Barrett was pregnant with twins and needed the help of an assistant. As a result, Ms. Barrett struggled to work while on bedrest. She was forced to engage in more physical movement and deal with increased stress, which contributed to her early labor in May of 2014 at twenty-three (23) weeks.

***Defendants Unlawfully Retaliate Against Ms. Barrett***

132. Defendants grew increasingly hostile toward Ms. Barrett after her two pregnancies, both of which had required bedrest. As noted above, Defendants openly and repeatedly expressed disapproval of Ms. Barrett's pregnancies and her status as a single mother.

133. Defendants' disapproval over time graduated to overt acts of retaliation, where Defendants treated Ms. Barrett less favorably than her similarly situated male co-workers.

134. Indeed, after giving birth and while Ms. Barrett was a single mom working full-time from home, caring for her twins who had multiple health complications, the Defendants offered her none of the support given to her male counterparts. As a result, Ms. Barrett lost various contracts. Moreover, at no time did Defendants offer Ms. Barrett the option of taking FMLA leave. At one point during this period, instead of helping Ms. Barrett confirm pending bookings, E.T. cancelled her bookings by saying: "It was too much to handle," implying that if Ms. Barrett was not "busy giving birth" or "taking care of infants," she would have been able to handle it and he would not have had to cancel the booking. As a result, Ms. Barrett lost out on a $12,000.00 commission.

135. In October of 2015, six (6) months after giving birth, one of Ms. Barrett's twin boys died tragically.

136.   One month after the tragic death of Ms. Barrett's infant son, Defendants actually disciplined her for allegedly permitting one of her accounts to fail quality control ("QC").

137.   In all of Ms. Barrett's years with Defendants, this was the first time that one of her accounts had failed QC, nonetheless Defendants cut her commission on this account from 20% to 10%, and this cut lasted throughout the remainder of her employment.   When other employees failed QC, especially for the first time, Defendants merely verbally admonished them.

138.   In or around December of 2014, Defendants also completely cut Ms. Barrett's salary by removing her bi-weekly draw amount altogether.

139.   Unlike her male counterparts, Defendants restricted Ms. Barrett's ability to work from home to two (2) days per week.

140.   Specifically, in June of 2016, Defendants required Ms. Barrett to work in the office full- time.  Because Ms. Barrett was commuting to Staten Island from New Jersey, and was a single mother, it was agreed that on the days when she came into the office, she could arrive to work between 9:00 a.m. and 9:30 a.m.

141.   Defendants also continued to badger Ms. Barrett for alleged QC issues.  On multiple occasions, E.T. used this issue as a basis to openly call Ms. Barrett "Stupid."

142.   In April of 2018, the Defendants began scrutinizing Ms. Barrett's arrival time, and told her that she needed to arrive every day by 9:00 am.  Yet, at the same time, Defendants continued to provide other employees with flexible work arrival times.  On the advice of HR, Ms. Barrett asked her manager Ciaravino to officially change her start time to 9:30 a.m.  Ciaravino denied her request and refused to provide her with a reason for the denial.  Shortly after her request, Ciaravino began switching Ms. Barrett's leads and routing them to two male sales representatives.

143.    Unfortunately, Ms. Barrett was involved in a car accident in August of 2018 and sustained serious physical injuries.  When Ms. Barrett spoke to Ciaravino about taking time off for treatment and recovery, he directed her to use her vacation time and take no more than one week off.  On September 14, 2018, the week following Ms. Barrett's return to work from her injuries, she arrived approximately four (4) minutes late to work and Defendants terminated her employment on that day.

144.    Clearly, after years of devaluing Ms. Barrett and treating her less favorably as a result of her gender, pregnancies and status a single mother, Defendants manufactured a reason to unlawfully terminate her employment.

## **JENNIFER JACOVINO**

### *Mrs. Jacovino's Employment with Defendants*

145.     Defendants hired Mrs. Jacovino in or around July of 2005 as a full-time sales representative with a starting salary of $10.00 per hour.

146.    During the course of her fourteen (14) years of employment with Defendants, Mrs. Jacovino was a loyal and versatile employee who excelled in the positions of sales consultant, receptionist, billing clerk, HR assistant, general manager, project manager, controller, finance manager, and executive assistant.

147.    Despite Mrs. Jacovino's distinguished performance, Defendants subjected her to a continuous pattern of discrimination and retaliation which, like Ms. Barrett, began from the moment Mrs. Jacovino disclosed her first pregnancy in December of 2014, and ended with her constructive discharge in September of 2019.   Throughout this time, Mrs. Jacovino endured systemic violations involving Defendant's continuing policy and practice of gender, pregnancy and familial status discrimination.

***Mrs. Jacovino is Subjected to Defendants' Longstanding Policy and Practice of Discrimination Because of Her Gender, Pregnancy and Familial Status***

148.  In 2014, Mrs. Jacovino held the title of manager and controller and her duties included accounts receivable, processing payroll and commissions.

149.  During the summer of 2014, Mrs. Jacovino found out that she was pregnant and informed her boss, Defendant E.T. about the pregnancy. Similar to his responses to Ms. Barrett's pregnancies, E.T. harassed her about her due date, and repeatedly made improper comments to her such as: "How could you do this to me? "You need to get back to work right away?" and "Who is going to watch the baby?" "Aren't you concerned about your weight? "You are going to put all your weight back on!"

150.  At this time, Mrs. Jacovino had worked at least 1250 hours during the previous 12-month period and was therefore eligible for FMLA leave.

151.  Mrs. Jacovino gave birth to her first child on April 16, 2015. The next day, E.T. visited Mrs. Jacovino in the hospital and asked her when she was coming back to work. He informed Ms. Jacovino that Defendants needed her to continue to work while she was out on payroll submissions and other related tasks.

152.  Upon being released from the hospital, Mrs. Jacovino was bedridden and under the care of an in-home nurse, healing from a C-section infection.

153.  As with Ms. Barret, at no time did Defendants provide Mrs. Jacovino the option of taking FMLA leave, or advise her of her rights under FMLA.

154.  As with Ms. Barrett, Defendants bombarded Mrs. Jacovino with daily phone calls and texts, expecting her to work from home and be reachable 24/7, despite the fact that she was out on maternity leave.

155.    On one occasion while Mrs. Jacovino was working from home following her pregnancy, she received an angry phone call from Defendant E.T. questioning her about a bonus that she had received for settling the accounts of two other male employees.  Despite the fact that it was E.T. who initially set up Mrs. Jacovino's bonus compensation in – in his words; "Jen you are the one doing all the work, make Anthony and Jerry pay for it!" – after Mrs. Jacovino gave birth, E.T. suddenly took the position that she was "making too much money."   E.T. told her to "say goodbye" to her bonus and stopped her bonuses from that point onward.

156.    Further, E.T. was verbally abusive to Mrs. Jacovino when he called her.  He would scream and curse, and say things to her like: "What are you f*ing stupid?" "You don't do anything right!  You are lucky to have this job!" "Where are you going to go with no college education, a girl from Staten Island?!"

157.    When Mrs. Jacovino finally returned to the office in August of 2015, Defendants unlawfully demoted her. Defendants gave Kelly Mauro ("Mauro") Mrs. Jacovino's former tittle as controller, and reduced her annual pay from $86,000.00 to $70,000.00 (in addition to eliminating her bonus, as mentioned earlier).   Defendants provided no explanation for this unlawful and improper demotion.

158.    Defendants then removed Mrs. Jacovino from her former single office, placed her in an office with Defendant N.C., and relegated her to an assistant position primarily handling finance tasks.

159.    In July of 2016, Mauro left Coachways and E.T. directed Mrs. Jacovino to resume her old position and promised to raise her salary back to $86,000.

160.    Defendants did not, however, restore Mrs. Jacovino to her prior rate of pay, even after she had resumed her former position.  Instead, after fifteen (15) months, and only after Mrs.

Jacovino complained to Defendant E.T., did she receive a bump in her salary back up to $81,000.00, which was still $5,000.00 less than her original salary.

***Defendants' Continuous and Systemic Discriminatory Policy and Practice***

161.    In September of 2017, Mrs. Jacovino found out she was pregnant again, and informed E.T.   Not surprisingly, E.T. berated her with improper remarks, just as he had done after her first pregnancy: "What the f*ck Jen?  How are you going to do your work with 2 kids now?!"

162.    At this time, Mrs. Jacovino had worked at least 1250 hours during the previous 12-month period, and was therefore eligible for FMLA leave.

163.    In December of 2017, Defendant E.T. verbally abused Mrs. Jacovino in front of two other employees, Ashely Simms and Michael Yehia.   Defendant E.T. called Mrs. Jacovino a "slacker."  When Mrs. Jacovino attempted to speak up for herself, E.T. told her: "I don't like how you talk back to me with your nasty, bitchy attitude" and "Who are you to feel like you are entitled to be a bitch?! If you have a problem, say it or leave!"

164.    In May of 2018, Mrs. Jacovino gave birth to her second child.  Just like the first time, Defendants required that she work from home completing payroll, answering emails, and to be readily accessible to E.T. and the needs of the finance department.  Defendants wasted no time in acting unlawfully while Mrs. Jacovino was in the hospital giving birth to her second child. Immediately upon her departure, Defendants listed her controller position on Indeed.com.  When confronted with this fact by Mrs. Jacovino, Defendant E.T. responded: "Let's be real, you don't have a degree.  I know you've helped us out over the years, but you have no education for this position."

165.    Also, Defendants again unlawfully reduced Mrs. Jacovino's salary, just as they had after the birth of her first child.

166.     While Mrs. Jacovino was forced to work full-time during her so-called maternity leave, Defendants accused her of "stealing" from the company because she was being paid, despite the fact that she was working full-time while at home.

***Defendants' Continuous and Systemic Retaliatory Policy and Practice***

167.     When Mrs. Jacovino returned to work in the office, she learned that Defendants had replaced her as Controller and once again demoted her.   Defendants also now required her to come to the office five (5) days a week instead of allowing her to home on Fridays.   Because of childcare issues, she was left with no option but to not work at all on Fridays and take a cut in pay.

168.     Further, after her pregnancies. Defendants openly criticized Ms. Jacovino about her weight.

169.     In addition to the outrageous, illegal, and discriminatory acts cited above, Defendants engaged in other acts of aggressive and harassing behavior toward Mrs. Jacovino which caused her to suffer severe emotional distress and made her feel unsafe.

170.     Throughout Mrs. Jacovino's tenure, E.T. would also threaten her with statements such as: "You can never leave unless you get whacked" and "You know too much, you can take us down."   On September 16, 2019, Mrs. Jacovino could no longer handle the hostile, harassing, threatening and toxic work environment, and the blatant acts of discrimination and retaliation, so she decided to tender her resignation.

## **JOSEPH JACOVINO**

***Mr. Jacovino's Employment with Defendants***

171.     Defendants hired Mr. Jacovino in 2005 as a full-time sales representative.

172.     During the course of his fourteen (14) years of employment with Defendants, Mr. Jacovino was an exemplary sales employee with an unmatched book of business of $6,000,0000. Despite consistently being the top sales representative, Defendants grossly underpaid Mr. Jacovino

in comparison to other similarly situated managers, all of whom were childhood friends of M.T., E.T., and N.G.

173.     After many months of harassment and verbal abuse at the hands of Defendants, which began in 2019 -- when the Defendants introduced an unlawful and coercive ultimatum forcing him to sign a new non-compete agreement or face termination -- Mr. Jacovino resigned from his position on September 16, 2019.

***Defendants' Intentional Infliction of Emotional Distress on Joseph Jacovino***

174.     In addition to being Defendants' top sales representative, Mr. Jacovino was also required to handle all of Defendants' building maintenance issues, as well as compliance with all of their government contracts.  Defendants compensated Mr. Jacovino with an annual salary rate of $140,000, which was far below what the market rate was for other similarly situated employees with comparable duties and responsibilities.

175.     In or around March of 2019, Defendants called all departments into a meeting. At this meeting, HR handed everyone a non-compete agreement and told employees that they had seven (7) days to sign it or they would be terminated.  Mr. Jacovino sought legal counsel to negotiate its terms.

176.     In April of 2019, Mr. Jacovino had still not signed his non-compete, and Defendant M.T. confronted Mr. Jacovino about him not signing the agreement.  When Mr. Jacovino advised M.T. that he had engaged counsel, and that his attorney had advised him that he could not sign the agreement as written, Defendant M.T. became enraged and began shouting at Mr. Jacovino.

177.     During this April 2019 confrontation, Mr. Jacovino described his concerns about how he and other managers had been treated, specifically, that they were undervalued and losing out on bonuses and commissions in order to pay for the personal expenses of Defendants M.T. and

E.T.  At that point, M.T. said "Joe how about we go outside and settle this," and when they stepped outside, M.T. threatened Mr. Jacovino, shouting at him that "I will kick your f*ing ass!"

178.  Discussions continued in April and May of 2019 regarding Mr. Jacovino's salary and the non-compete agreement.  On or about June 3, 2019, E.T. represented to Mr. Jacovino that they would work something out on the agreement and get him the additional salary that he had requested.  On that same day, M.T. called Mr. Jacovino into his office, repeatedly cursed at him, called him a "dick," threatened to fight him, and told him that he would "rip his f*ing head off."

179.  On that same day, manager Ciaravino called Mr. Jacovino into his office by yelling: "Hey Don Fanucci, come in here!" Ciaravino then proceeded to warn Mr. Jacovino that while he knows he is negotiating, Jacovino should be careful.  Ciaravino said to him: "Do you remember what happened to Don Fanucci in the stairwell?"  Don Fanucci is a character in the Godfather movie.  Mr. Jacovino responded: "He got shot?"  Ciaravino then responded by shaping his hand into a gun, putting it in his own mouth, pulling the trigger then saying, "pigs get slaughtered Joe!"

180.  On June 4, 2019, Ciaravino sent Mr. Jacovino an email with a decapitated pigs head on a dish, repeating what he said to him the day before: "Pigs get slaughtered Joe."

181.  In June of 2019, Ciaravino also sent Mr. Jacovino an email with a video attached of the scene from the Godfather movie of Don Fanucci getting shot.

182.  Negotiations continued and on July 31, 2019, Mr. Jacovino's salary was increased from $140,000 to $200,000 per year.  Without any justification, Defendants then cut Mrs. Jacovino's annual salary amount by $40,000.

183.  After agreeing to increase Mr. Jacovino's salary, throughout August and September of 2019, until the time of his resignation, Defendants continued to harass Mr. Jacovino and pressure

him to sign his agreement, as well as get him to have Mrs. Jacovino to sign a non-competition agreement as well.

184.   On September 16, 2019, Mr. Jacovino could no longer handle the daily hostile, harassing, threatening and toxic work environment and so he tendered his resignation to M.T. That same day, when Mr. Jacovino discussed his resignation with Defendant E.T. on the phone, E.T. replied: "Fine, good luck.  Don't force us to do what we have to do."

***Defendants Threaten Mr. Jacovino After Learning About His Plan to File a Lawsuit.***

185.    As part of Defendants' intimidation tactics, on December 15, 2019, one month after Defendants received Mr. Jacovino's notice of intent to sue, M.T. spotted Mr. Jacovino shopping at a convenience store and waited for him to come out.  M.T. cursed and belittled him, threatening that if Mr. Jacovino carried through with the instant lawsuit, M.T. would come after Mr. Jacovino and his family.  Mr. Jacovino reported the incident to the NYPD and filed a harassment complaint against M.T.

186.    In March of 2020, Defendants filed a retaliatory lawsuit against Mr. Jacovino for trademark infringement, alleging Mr. Jacovino's company US Trailways, Inc. has and continues to conduct business in one or more names identical/confusingly similar to Defendants' registered trademarks.[2]   As a reminder of what this suit is really all about -- illegal retaliation -- Defendants told Mr. Jacovino in February of 2020 they would be willing to drop their suit in exchange for general releases from Mr. Jacovino and his wife.

---

[2] U.S. Bus Charter and Limo, Inc. v. US Trailways, Inc. *et al*., Dkt. No.: 120-CV-00402 (MKB) (RML) (E.D.N.Y. 2020)

## AS FOR A FIRST CAUSE OF ACTION BY
## PLAINTIFFS MS. MCCLAIN, MS. JACKMAN AND MS. SOLOMON
### (Racial Discrimination in Violation of 42 U.S.C.§ 1981)

187.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

188.    42 U.S.C. § 1981 prohibits discrimination in the terms, conditions and privileges of employment on the basis of an individual's race.

189.    Defendants, as detailed above, discriminated against Ms. McClain, Ms. Jackman and Ms. Solomon  in violation of the 42 U.S.C. § 1981 by subjecting them to a hostile work environment and adverse job actions, in the form of highly inappropriate and grossly improper racial remarks and abusive conduct, which resulted in Ms. McClain, Ms. Jackman and Ms. Solomon being treated less favorably based upon their race, and no remedial action was implemented at any time.

190.    Specifically, in comparison to her white counterparts, Ms. McClain was underpaid for her role as HR Manager for four (4) companies and was subjected to the use of the "N" word in the workplace, along with disparaging comments about "black" people.   Workplace investigations were not taken seriously and were dismissed by Defendants whenever white employees were the subject of workplace complaints.

191.    Ms. Jackman was forced to endure blatant, open, and egregious acts of racial harassment.  Specifically, she was she was referred to as a "Black Bitch," "N***er Bitch," "Black N**gger" and "N***er cry baby," along with disparaging comments about "black" people. Workplace investigations were not taken seriously and were dismissed by Defendants because a white employee was the subject of the investigation.

192. Ms. Solomon was forced to endure blatant, open, and egregious acts of racial harassment. Specifically, Defendants' regular use of the "N" word. Workplace investigations were not taken seriously and were dismissed by Defendants because a white employee was the subject.

193. As a direct and proximate result of Defendants' discriminatory conduct in violation of 42 U.S.C. § 1981, Ms. McClain, Ms. Jackman and Ms. Solomon have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

## AS FOR A SECOND CAUSE OF ACTION BY
## PLAINTIFFS MS. MCCLAIN, MS. JACKMAN AND MS. SOLOMON
### (Racial Discrimination in Violation of the NYSHRL and NYCHRL)

194. Plaintiffs repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

195. The NYSHRL and NYCHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's race.

196. Defendants discriminated against Plaintiffs Ms. McClain, Ms. Jackman and Ms. Solomon in violation of the NYSHRL and NYCHRL by permitting a hostile work environment, in the form of racial harassment culminating in their constructive discharge.

197. Specifically, in comparison to her white counterparts, Ms. McClain was underpaid for her role as HR Manager for four (4) companies and was subjected to the use of the "N" word in the workplace along with disparaging comments about "black" people. Workplace

investigations were not taken seriously and were dismissed by Defendants if white employees were the subject of such investigations.

198.    Ms. Jackman was forced to endure blatant, open, and egregious acts of racial harassment.  Specifically, she was she was referred to as a "Black Bitch," "N***er Bitch," "Black N**gger" and "N***er cry baby," along with disparaging comments about "black" people. Workplace investigations were not taken seriously and were dismissed by Defendants because a white employee was the subject.

199.    Ms. Solomon was forced to endure blatant, open, and egregious acts of racial harassment.  Specifically, Defendants' regular use of the "N" word.  Workplace investigations were not taken seriously and were dismissed by Defendants because a white employee was the subject.

200.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL and NYCHRL, Ms. McClain, Ms. Jackman and Ms. Solomon have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**<u>AS FOR A THIRD CAUSE OF ACTION BY PLAINTIFF MS. SOLOMON</u>**
**(Violation of the Fair Labor Standards Act Of 1938, as Amended by the Equal Pay Act Of 1963 ("Equal Pay Act"), 29 U.S.C. § 206, *et. seq*.  Denial of Equal Pay for Equal Work)**

201.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

202.    Defendants are "employers" of Plaintiff Ms. Solomon within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as amended by the Equal Pay Act of 1963.

203.    Defendants have discriminated against Ms. Solomon by paying her less than similarly situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

204.    Defendants discriminated against Ms. Solomon by subjecting her to common discriminatory pay and performance management policies, including discriminatory salaries, commissions, and other compensation incentives, discriminatory assignments and other opportunities that would result in unequal compensation, and other forms of discrimination in violation of the Equal Pay Act.

205.    The differential in pay between Ms. Solomon and similarly situated male employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to sex.

206.    Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on sex in violation of the Equal Pay Act.

207.    Defendants intentionally paid Ms. Solomon less than similarly situated male employees.  The foregoing conduct constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

208.    Accordingly, Ms. Solomon is entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## AS FOR A FOURTH CAUSE OF ACTION BY
## PLAINTIFF MS. JOHNSON
### (Sexual Harassment and Gender Discrimination
### in Violation of the NYSHRL and NYCHRL)

209.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

210.     The NYSHRL and NYCHRL prohibit sexual harassment in the workplace and discrimination in the terms, conditions and privileges of employment on the basis of gender.

211.     Plaintiff Ms. Johnson was an "employee" within the meaning of the NYSHRL and NYCHRL while Defendants are covered "employers" under the NYCHRL and NYSHRL.

212.     As set forth above, Defendant N.C. discriminated against Ms. Johnson in violation of the NYSHRL and NYCHRL by subjecting her to a hostile work environment in the form of highly inappropriate remarks and suggestions, persistent unsolicited compliments and piercing sexual stares.

213.     Furthermore, Defendants had notice that the harassing behavior was going on, yet rather than stop it from continuing, Defendants turned a blind-eye, retaliated against Ms. Johnson for reporting it and constructively discharged her.

214.     As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL and NYCHRL, Ms. Johnson has suffered, and continues to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### AS FOR A FIFTH CAUSE OF ACTION BY
### PLAINTIFFS MS. BARRETT AND MRS. JACOVINO
**(Discrimination on the Basis of Gender and Pregnancy
in Violation of the NYSHRL and NYCHRL)**

215.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

216.     The NYSHRL and NYCHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's gender and pregnancy status.

217.     Defendants, as described above, discriminated against Plaintiffs Ms. Barrett and Mrs. Jacovino in violation of the NYSHRL and NYCHRL by permitting a hostile work environment, in the form of harassment based upon Ms. Barrett's and Mrs. Jacovino's gender and pregnancy.

218.     Specifically, throughout the course of Ms. Barrett's two pregnancies, Defendants verbally berated her, harassed her about keeping up with her work and gave her less favorable terms and conditions of employment than her male counterparts.  In furtherance of their discriminatory conduct, Defendants retaliated against Ms. Barrett by removing her privileges, cutting her salary and commission and by subjecting her to disciplinary action.  Defendants' continuous discriminatory conduct collectively constitutes one unlawful employment practice.

219.     Similarly, throughout the course of Mrs. Jacovino's speaking disparagingly about her sex and berated her for being pregnant, about her weight and harassed her about keeping up with her work during her pregnancy and gave her less favorable terms and conditions of employment than her male counterparts.  In furtherance of their discriminatory conduct, Defendants retaliated against Mrs. Jacovino by cutting her salary and demoting her.  Defendants' continuous discriminatory conduct collectively constitutes one unlawful employment practice.

220. By engaging in the foregoing conduct, Defendants have violated Ms. Barrett's and Mrs. Jacovino's rights under the NYSHRL and NYCHRL.

221. As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL and NYCHRL, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

### AS FOR A SIXTH CAUSE OF ACTION BY PLAINTIFFS MS. BARRETT AND MRS. JACOVINO (Discrimination on the Basis of Familial Status and Caregiver Status in Violation of the NYSHRL and NYCHRL)

222. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

223. The NYSHRL and NYCHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's caregiver status and familial status.

224. Plaintiffs Mrs. Barrett and Mrs. Jacovino were "employees" within the meaning of the NYSHRL and the NYCHRL, while the Defendants are "employers" and "persons."

225. Specifically, throughout the course of Ms. Barrett's two pregnancies, Defendants verbally berated her, harassed her about keeping up with her work and gave her less favorable terms and conditions of employment than her male counterparts. In furtherance of their discriminatory conduct, Defendants retaliated against Ms. Barrett by removing her privileges, cutting her salary and commission, and by subjecting her to baseless and retaliatory disciplinary action. Defendants' continuous discriminatory conduct collectively constitutes one unlawful employment practice.

226. Similarly, throughout the course of Mrs. Jacovino's employment, Defendants continuously spoke disparagingly about her sex, berated her for being pregnant, disparaged her about her weight and harassed her about keeping up with her work during her pregnancy, and gave her less favorable terms and conditions of employment than her male counterparts. In furtherance of their discriminatory conduct, Defendants retaliated against Mrs. Jacovino by cutting her salary and demoting her. Defendants' continuous discriminatory conduct collectively constitutes one unlawful employment practice.

227. By engaging in the foregoing conduct, Defendants have violated Ms. Barrett's and Mrs. Jacovino's rights under the NYSHRL and NYCHRL.

228. As a direct and proximate result of Defendants' conduct in violation of the NYSHRL and NYCHRL, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**AS FOR A SEVENTH CAUSE OF ACTION BY**
**PLAINTIFFS MS. BARRETT AND MRS. JACOVINO**
**(Failure to Provide a Reasonable Accommodation**
**in Violation of the NYSHRL and NYCHRL)**

229. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

230. The NYSHRL and the NYCHRL prohibits retaliation by any person against any individual who in good faith requires a reasonable accommodation for disability.

231. Plaintiffs Mrs. Barrett and Mrs. Jacovino were "employees" within the meaning of the NYSHRL and the NYCHRL, while the Defendants are "employers" and "persons."

232.     As set forth above, Defendants failed to reasonably accommodate Mrs. Jacovino, in violation of the NYSHRL and NYCHRL, when Defendants required Mrs. Jacovino to work while she was still in the hospital the day after giving birth.   Defendants further violated the NYSHRL and NYCHRL by continuing to direct her to work even when she was still healing from her own C-Section surgery and by requiring her to be reachable by Defendants 24/7 while she was out on maternity leave.

233.     As set forth above, Defendants failed to reasonably accommodate Ms. Barrett in violation of the NYSHRL and NYCHRL when Defendants required Ms. Barrett to work from home while on bedrest, directing her to ignore her doctor's orders to do so and holding her to be accountable to meet her sales quotas while on bedrest.

234.     By engaging in the foregoing conduct, Defendants violated Ms. Barrett's and Mrs. Jacovino's rights under the NYSHRL and NYCHRL.

235.     As a direct and proximate result of Defendants' conduct in violation of the NYSHRL and NYCHRL, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**AS FOR AN EIGHTH CAUSE OF ACTION BY**
**PLAINTIFFS MS. BARRETT AND MRS. JACOVINO**
**(FMLA Interference in Violation of 29 U.S.C § 2615(a)(1))**

236.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

237. On two separate occasions, when Ms. Barrett was on FMLA leave for her pregnancy related disabilities and the birth of her children, Defendants insisted that Ms. Barrett continue to work, even if from home, and continue to meet her sales quotas.

238. Like Ms. Barrett, on two separate occasions, when Mrs. Jacovino was on FMLA leave for her two pregnancy related disabilities and the birth of her children, Defendants insisted that Mrs. Jacovino continue to work, even if from home, and that she continued to be completely accessible at all times to Defendants.

239. Defendants denied Ms. Barrett's and Mrs. Jacovino's statutory right to take FMLA leave without interference and therefore impeded Plaintiffs' rights to the statutory benefits of FMLA.

240. As a direct and proximate result of Defendants' conduct in violation of the FMLA, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

### AS FOR A NINTH CAUSE OF ACTION BY
### PLAINTIFFS MS. BARRETT AND MRS. JACOVINO
### (FMLA Retaliation in Violation of 29 U.S.C § 2615(a)(2))

241. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

242. As set forth above, Defendants were unhappy that Ms. Barrett had become pregnant twice within a short period of time, and that those pregnancies required her to take FMLA leave for bedrest. Upon returning from FMLA leave from her second pregnancy, Defendants removed

Ms. Barrett's work privileges, cut her salary and commission, and subjected her to disciplinary action.

243.    As set forth above, on both occasions that Mrs. Jacovino took FMLA and then returned to work, her pay was cut, she was demoted and/or her position was replaced.

244.    As a direct and proximate result of Defendants' violation of the FMLA, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**AS FOR A NINTH CAUSE OF ACTION BY
PLAINTIFFS MS. MCCLAIN, MS. JACKMAN,
<u>MS. SOLOMON, MS. JOHNSON, MS. BARRETT AND MRS. JACOVINO</u>
(Retaliation in Violation of the NYSHRL and NYCHRL)**

245.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

246.    The NYSHRL and NYCHRL prohibit retaliation by any person against any individual who in good faith complains about discriminatory practices to which he or she has been subjected.

247.    Plaintiffs Ms. McClain, Ms. Jackman, Ms. Solomon, Ms. Johnson, Ms. Barrett and Mrs. Jacovino were all "employees" within the meaning of the NYSHRL and NYCHRL, while the Defendants are "employers" under the NYSHRL and NYCHRL.

248.    As set forth above, Defendants retaliated against Ms. McClain in violation of the NYSHRL and NYCHRL when Ms. McClain, in good faith, voiced her opposition to Defendants' unlawful discriminatory practices based on race.  Defendants removed Ms. McClain's authority

and although did not remove her title, demoted her. Ms. McClain was the target of verbal abuse and called a "rat" for voicing good faith concerns about discriminatory practices by the Defendants.

249. As set forth above, Defendants retaliated against Ms. Jackman in violation of the NYSHRL and NYCHRL when Plaintiff, in good faith, voiced her opposition to Defendants' unlawful discriminatory practices based on race. In retaliation for not acquiescing to the unlawful conduct, Defendants allowed the harasser to intensify the harassment and intimidate Ms. Jackson with violent conduct causing her to suffer a panic attack and culminating in her constructive discharge.

250. As set forth above, Defendants retaliated against Ms. Solomon in violation of the NYSHRL and NYCHRL when Plaintiff, in good faith, voiced her opposition to Defendants' unlawful discriminatory practices based on race and gender. In retaliation for not acquiescing to the unlawful conduct, Defendants intensified the harassment and threatened her with termination which culminated in her constructive discharge.

251. As set forth above, Defendants retaliated against Ms. Johnson in violation of the NYSHRL and NYCHRL when Ms. Johnson reported her supervisor's sexual harassment. Defendants not only failed to take any remedial action, but also, allowed Ms. Johnson's supervisor to retaliate against her by unduly criticizing her work performance without any basis for doing so.

252. As set forth above, Defendants were unhappy that Ms. Barrett had become pregnant twice within a short period of time, and that those pregnancies required a reasonable accommodation for bedrest. Upon returning to work from her second pregnancy, Defendants removed Ms. Barrett's work privileges, cut her salary and commission, and subjected her to disciplinary action.

253. Additionally, on or about August of 2019, Ms. Barrett was in a car accident in which she sustained serious physical injuries. Her injuries required her to take a reasonable accommodation of leave for a few weeks. On the day that she returned from leave, Defendants terminated Ms. Barrett's employment for showing up to work 4 minutes late. This alleged reason for her termination was entirely pretextual in nature, as in fact, Defendants terminated Ms. Barrett solely in retaliation for her having taken maternity leave as an accommodation.

254. As set forth above, on both occasions that Mrs. Jacovino returned from maternity leave, Defendants cut her salary, demoted her and/or replaced her position.

255. As a direct and proximate result of Defendants' retaliatory conduct in violation of the NYSHRL and NYCHRL, Ms. McClain, Ms. Jackman and Ms. Solomon, Ms. Johnson, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**AS FOR A TENTH CAUSE OF ACTION BY**
**PLAINTIFFS MS. MCCLAIN, MS. JACKMAN,**
**MS. SOLOMON, MS. JOHNSON, MS. BARRETT AND MRS. JACOVINO**
(*Aiding and Abetting* in Violation of the NYCHRL against Defendants M.T., E.T. and N.C.)

256. Plaintiff hereby repeats, reiterates and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

257. As set forth above, Defendants M.T., E.T. and N.C. had notice that their employees were engaging in discriminatory and retaliatory practices, but rather than stop such unlawful practices from continuing, M M.T., E.T. and N.C. aided and abetted this type of behavior by

turning a blind-eye to Plaintiffs Ms. McClain's, Ms. Jackman's, Ms. Solomon's, Ms. Johnson's, Ms. Barrett's and Mrs. Jacovino's harassment and hostile work environment.

258.     Defendants M.T., E.T. and N.C. knowingly aided and abetted to Defendants' discriminatory and retaliatory employment practices Plaintiffs Ms. McClain, Ms. Jackman, Ms. Solomon, Ms. Johnson, Ms. Barrett and Mrs. Jacovino were forced to endure in violation of the NYCHRL.

259.     As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYCHRL, Ms. McClain, Ms. Jackman and Ms. Solomon, Ms. Johnson, Ms. Barrett and Mrs. Jacovino have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

## AS FOR AN ELEVENTH CAUSE OF ACTION BY PLAINTIFFS
### (Intentionally Infliction of Emotional Distress on Plaintiffs)

260.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

261.     As set forth above, Defendants' discriminatory treatment of Plaintiffs Ms. McClain, Ms. Jackman, Ms. Solomon, Ms. Johnson, Ms. Barrett, Mrs. Jacovino and Mr. Jacovino was intentional, reckless, extreme and outrageous, and caused Plaintiffs to suffer severe emotional distress.

262.     As set forth above, Defendants have subjected Mr. Jacovino to intentional infliction of emotional distress in the form of harassment, verbal abuse and threats of physical violence and death against himself and his family.

263. Defendants' discriminatory conduct was extreme, outrageous, malicious, and dangerous to the physical, mental and emotional well-being of Plaintiffs, beyond the standards of civilized decency, and utterly intolerable in a civilized society.

264. As a consequence of Defendants' intentional wrongful actions, Plaintiffs were seriously injured, were subjected to fear, personal humiliation and degradation, and suffered and continue to suffer severe mental and emotional distress.

265. As a consequence of Defendants' intentional wrongful actions, Plaintiffs have suffered, and continue to suffer, irreparable injury and monetary damages in an amount to be determined at trial, as well as punitive damages, costs and attorneys' fees, and any other relief this Court may find just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request judgment as follows:

a) Award Plaintiffs their past and future loss of wages and benefits, plus interest;

b) Award Plaintiffs liquidated damages;

c) Award Plaintiffs compensatory and punitive damages;

d) Award Plaintiffs all costs and reasonable attorneys' fees incurred in connection with this action; and

e) Grant Plaintiffs such additional or alternative relief as the Court deems just and proper.

Date: New York, New York
April 7, 2020

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By: _____/s/_____
Jon L.  Norinsberg, Esq.
Bennitta L.  Joseph, Esq.
Diego O.  Barros, Esq.
225 Broadway, Suite 2700
New York, New York 10007
Tel: (212) 227-5700
Fax: (212) 406-6890
*Attorneys for Plaintiffs*

To:     U.S. Coachways, Inc.
        100 St. Mary's Avenue
        Staten Island, New York 10305
        *Defendant*

        KM Enterprises of NY, Inc.
        100 St. Mary's Avenue
        Staten Island, New York 10305
        *Defendant*

        American Tour & Travel, Inc.
        100 St. Mary's Avenue
        Staten Island, New York 10305
        *Defendant*

        Subout.com, LLC
        100 St. Mary's Avenue
        Staten Island, New York 10305
        *Defendant*

        Ultra-Express Coach, Inc.
        480 Wild Avenue
        Staten Island, New York 10314
        *Defendant*

        Mark Telmany
        100 St. Mary's Avenue
        Staten Island, New York 10305
        *Defendant*

Edward Telmany
100 St. Mary's Avenue
Staten Island, New York 10305
*Defendant*

Nicholas Cianciaruso
100 St. Mary's Avenue
Staten Island, New York 10305
*Defendant*